**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION**

| | |
|---|---|
| CHRIS THACKER, M.D. et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>MAXIMUS, INC. and DOES 1-50,<br><br>Defendants. | CV 25-177-M-WWM<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS AND STRIKING PUNITIVE DAMAGES |

Chris Thacker and ten other medical professionals ("Plaintiffs") filed a complaint against Maximus, Inc. ("Maximus"),[1] administrator of the Montana Medical Assistance Program ("MAP"), alleging four counts: Negligence, Violations of the Montana Consumer Protection Act ("MCPA"), Tortious Interference with Business Relations, and Breach of the Covenant of Good Faith and Fair Dealing ("Complaint"). (Doc. 1 at 7, 19-22). Plaintiffs also request punitive damages. (Doc. 1 at 23). Each allegation arises from Maximus's administration of the MAP, which Plaintiffs contend violates the many duties Maximus owed them, resulting in financial harm, emotional distress, loss of livelihood, and the suicide of one MAP participant. *Id.* at 16. Plaintiffs seek class certification under 28 U.S.C. § 1332(d) and Federal Rule of Civil Procedure 23.

[1] To date, no other Defendant has appeared in this matter, so the Court refers to Maximus either by name or as the singular "Defendant" throughout.

*Id.* at 6, 16-18. Maximus filed a Rule 12(b)(6) Motion to Dismiss Plaintiffs' Complaint ("Motion"). (Doc. 22).[2]

A hearing on the Motion was held on September 24th.

## I. Background

Montana law requires creation of a medical assistance program by six professional boards - - the Board of Medical Examiners, the Board of Dentistry, the Board of Pharmacy, the Board of Nursing, the Board of Chiropractors, and the Board of Veterinary Medicine - - to establish a program to assist and rehabilitate their licensees who are found to be "physically or mentally impaired by habitual intemperance or the excessive use of addictive drugs, alcohol, or any other drug or substance or mental illness or chronic physical illness." Mont. Code Ann. §§ 37-3-203(2), 37-4-311, 37-7-201(4)(g), 37-8-202(1)(j), 37-12-201(7), and 37-18-204 (2025). A licensee may be required to participate by their professional board or may enter the program voluntarily. *Id.* Since 2011, any existing medical assistance program has been subject to a statutory audit requirement for the evaluation of "performance objectives as determined by each licensing board" twice in a ten-year period, an "external audit" every five years, and an internal

[2] Plaintiffs filed a response on February 27th, and Maximus filed a reply on March 13th. (Docs. 26 and 27, respectively).

audit facilitated by the Montana Department of Labor and Industry ("DLI") within three years of the external audit. Mont. Code Ann. § 37-2-316.

In October 2022, Maximus contracted with DLI to manage the Medical Assistance Program for a term beginning January 1, 2023, and ending December 31, 2025. (Doc. 22-1, at 2-4).[3] The purpose of the contract was to facilitate the program: to monitor and rehabilitate participating licensees suffering from addiction, mental illness, or chronic physical illness. *Id.* at 2. Plaintiffs assert that they were participants in the MAP during this timeframe. (*See* Doc. 1 at 2). Plaintiffs allege: "When Maximus took over the [MAP], the focus of the program shifted from the well-being of the participants and reducing the stigma of substance use and mental health disorders to a punitive program focused on excessive monitoring and profiteering." *Id.* at 8. Plaintiffs represent that Maximus owed them the following duties:

- "[A] duty of transparency and accountability regarding processes and procedures to facilitate communication and strengthen relationships." (Doc. 1 at 7).

---

[3] In ruling on Defendant's motion, the Court considers Maximus's agreement with DLI as central to the Plaintiffs' claims and of undisputed authenticity ("Agreement"). (Doc. 22-1). Such documents are "incorporated by reference" into the Complaint. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) ("We have extended the 'incorporation by reference' doctrine to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint"). At the hearing, Plaintiffs encouraged the Court to review the Agreement and argued that the Agreement is central to their duty claims. Accordingly, the Court deems incorporation of the Agreement a stipulated matter.

- "[T]he duty to ensure its recommendations follow clinical assessments and only to impose participant requirements aligned with professional evaluations." *Id.* at 8.
- "[T]he duty to share with them all evaluations, reports, and documentation about their enrollment and progress in the program." *Id.*
- "[T]he duty to tell them about consequences for noncompliance and criteria for extending monitoring, which should be clinically indicated and communicated to participants." *Id.* at 9.
- "[T]he duty to base noncompliance and sanctions on clinical evidence." *Id.*
- "[T]he duty to use toxicology testing consistent with clinical assessments." *Id.* at 10.
- "[T]he duty to provide reliable systems for tracking and documenting referral information and case status to ensure quality assurance and participant engagement." *Id.* at 11.
- "[T]ransparency about program costs, including fees for testing or required support groups." *Id.*
- "[T]he duty to collaborate with treatment providers to ensure appropriate and accessible care, including support groups tailored to participant needs." *Id.* at 12.
- "[T]he duty to avoid conflicts of interest in all decisions, including those involving evaluators, treatment providers, toxicology testing, and other program service vendors or contractors." *Id.*

In their Complaint, Plaintiffs accompany these "duty statements" with allegations of instances in which Maximus has purportedly breached the duties. (*See generally* Doc. 1 at 7-13). For example, in alleging a breach of a duty to tell participants "about consequences for noncompliance and criteria for extending monitoring," Plaintiffs state: "Maximus breached these duties by keeping participants in the program for indefinite periods without clinically-justified extensions of monitoring. Maximus arbitrarily prolonged participation . . . without regard to participant well-being or evidence-based clinical practices." (Doc. 1

at 9). Further, Plaintiffs claim to be members of a class including "[a]ll current and former participants in the [MAP] administered by Maximus, Inc." and argue that the interests of all similarly-situated individuals "are best served by a class action." *Id.* at 19.

In its motion to dismiss, Maximus claims it "operates the [MAP] as specified by its contract with the State of Montana and applicable Montana law" (Doc. 22 at 8) and that Plaintiffs' "generalized grievances, sweeping conclusory assertions, and supposed harms" do not describe any interactions with MAP or Maximus to support their claims. *Id.* at 9. Maximus urges the Court to decline to certify Plaintiffs' class because "individual inquiries will be required to assess each individual putative class member's claims, such that no class-wide issues could possibly predominate." *Id.* at 32. In response, Plaintiffs maintain their Complaint is sufficient under Federal Rule of Civil Procedure 8 to survive dismissal and that dismissal based on a deficient class is premature because certification discovery is still pending. (Doc. 26 at 8).

## II. Legal Standards

Federal Rule of Civil Procedure 8 sets forth general rules of pleading, requiring that, among other things, a civil complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." A Complaint must contain sufficient factual allegations to make a plausible case for a claim.

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

"A Rule 12(b)(6) motion tests the legal sufficiency of a claim. *Cook v. Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Alvarez v. Chevron Corp.*, 656 F.3d 925, 930-31 (9th Cir. 2011). In reviewing a motion to dismiss, a court must construe a complaint's factual allegations in a light most favorable to the plaintiffs. *Id.* at 931. "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). In the Ninth Circuit, a motion to dismiss under Rule 12(b)(6) "is viewed with disfavor and is rarely granted." *Ernst and Haas Mgmt. Co., Inc. v. Hiscox, Inc.*, 23 F.4th 1195, 1199 (9th Cir. 2022). Rather, it is more appropriate to grant leave to amend a complaint that fails to state a claim, even when leave is not requested. *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir. 2000).

Only when a court is satisfied that a party cannot possibly cure deficiencies should the court order dismissal without leave to amend. *Jackson v. Carey,* 353

F.3d 750, 758 (9th Cir. 2003). However, while Federal Rule of Civil Procedure 8 and the opportunity for amendment are generous, they do not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678. Conclusory pleadings "are not entitled to the assumption of truth." *Id.* at 679.

## III. Discussion

The Court will discuss each of Plaintiffs' claims in turn. However, the Court first addresses the parties' conflict over class certification. Additionally, the Court will consider whether judicial notice or incorporation-by-reference of the Montana Legislative Audit Division report referenced in the Complaint is appropriate.

### A. A determination on class certification is premature.

Section 1332(d) of Title 28 of the U.S. Code allows a class action to proceed when the proposed class exceeds 100 members, at least one class member is a citizen of a state different from any defendant, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Federal Rule of Civil Procedure 23 governs the certification of class actions. The rule provides that one or more members of a class may sue or be sued as representative members only if:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)-(4). Under Rule 23(b), a class action can be maintained if Rule 23(a) is satisfied, along with one of the following:

(1) prosecuting separate actions by or against individual class members would create a risk of inconsistent adjudications with respect to individual class members or risk adjudications for individuals that, as a practical matter, would be dispositive of the interests of the other members' interests;

(2) the party opposing the class acts or refuses to act on grounds that apply generally to the class, so that final injunctive or declaratory relief is appropriate to the class as a whole; or

(3) there exists questions of law or fact common to class members which predominate over any questions affecting only individual members, making a class action superior to other methods of adjudication.

Once a class representative files suit, the district court "must determine by order whether to certify the action as a class action" as quickly as practicable. Fed. R. Civ. P. 23(c)(1)(A). "An order that certifies a class action must define the class and the class claims, issues or defenses and must appoint class counsel under Rule 23(g)." Fed. R. Civ. P. 23(c)(1)(B).

In support of class certification for "[a]ll current and former participants in the Montana Medical Assistance Program administered by Maximus, Inc," Plaintiffs allege the class "is so numerous that joinder of all members is impracticable," that all class members were harmed by Maximus in a common

manner, that each class member's claim is typical of others, and that the interests of the class will be fairly and adequately protected. (Doc. 1 at 16-18). While Plaintiffs purport to seek class certification "under each independent subpart of Rule 23(b)" (Doc. 1 at 18), they also admit that class certification discovery is incomplete. (Doc. 26 at 8). Plaintiffs do not address, for instance, whether voluntary participants in the MAP should be treated differently than those required to participate in the program as a disciplinary action, or whether differences in program participation status would bear on the appropriate remedy afforded to individuals. Defendants argue Plaintiffs' claims are reliant upon the interactions of individuals with Maximus's operations of the MAP and "subject only to individual, not class-wide proof." (Doc. 22 at 33).

The decision to address the issue of class certification on a motion to dismiss or defer until a motion for class certification is within the district court's discretion. *Wright v. Schock*, 742 F.2d 541, 545-36 (9th Cir. 1984); *Meyer v. UnitedHealthcare Insurance Co.*, 2023 WL 6241140 (D. Mont.) (citing *Davidson v. O'Reilly Auto Enters., LLC*, 968 F.3d 955, 963 (9th Cir. 2020), *Wisdom v. Easton Diamond Sports, LLC*, 824 Fed.Appx. 537, 538 (9th Cir. 2020), and *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009)). The Court finds that at this stage, without further information that will likely result from certification discovery, a motion for class certification would be a more appropriate vehicle for

arguments about class propriety. Therefore, the Court declines to rule on Plaintiffs' request for class certification under Rule 23.

### B. The Legislative Audit is a proper subject of judicial notice and incorporation-by-reference.

Plaintiffs refer to a recent Montana Legislative Audit Division report in the Complaint.[4] (Doc. 1 at ¶¶ 26, 31-33). At the hearing, Plaintiffs represented that the case is based on the performance audit. Generally, district courts may not consider materials outside the pleadings when assessing the sufficiency of a complaint under Federal Rule of Civil Procedure 12(b)(6). *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). When "matters outside the pleading are presented to and not excluded by the court," the 12(b)(6) motion converts into a motion for summary judgment under Rule 56. *Id.* (citing Fed. R. Civ. P. 12(d)). Once converted, both parties must have the opportunity "to present all the material that is pertinent to the motion." *Id.* There are two exceptions: judicial notice under Federal Rule of Evidence 201 and the incorporation-by-reference doctrine. *Id.*

Pursuant to Federal Rule of Evidence 201(b), the Court may "judicially notice a fact that is not subject to reasonable dispute" because it is either "generally

[4] Robert Bannatz, John Harrington, & Chelsea L. Rayfield, State of Mont., Legislative Audit Division, *Performance Audit: Montana Medical Assistance Program: DLI's Management of Contracted Monitoring Services for Impaired Healthcare Practitioners*, 23P-02 (August 2025) (cited as "Legislative Audit").

known within the trial court's territorial jurisdiction," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Accordingly, "a court may take judicial notice of matters of public record without converting a motion to dismiss into a motion of summary judgment . . . But a court cannot take judicial notice of disputed facts contained in such public records." *Khoja*, 899 F.3d at 999 (internal citations omitted); see also In re *Google Location History Litig.*, 428 F. Supp. 3d 185, 189 (N.D. Cal. 2019) (taking judicial notice that an exhibit "was in the public realm," and not for the truth of its contents). This is because courts bar defendants from using "requests for judicial notice to present [their] 'own version of the facts at the pleading stage.'" *Balestrieri v. SportsEdTV, Inc.*, 2025 WL 2776356, at *2 (N.D. Cal.) (citing *Khoja*, 899 F.3d at 998-99).

The performance audit was conducted by the Montana Legislative Audit Division. It is a matter of public record, and its sources cannot be reasonably questioned. The limits of the audit are also apparent. A significant aspect of the methodology was to survey stakeholders regarding the period of transition from the former vendor to DLI, then to Maximus. Legislative Audit at 13. While there are objective statements contained within the Legislative Audit, the Court is not in a position to parse statements of stakeholders from those collected from data. However, the existence of the Legislative Audit is subject to judicial notice.

"[I]ncorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Khoja*, 899 F.3d at 1002; *Knievel* 393 F.3d at 1076. "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja*, 899 F.3d at 1002. The purpose of this doctrine is to prevent "plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based." *Id.* (quoting *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998)). The Court may assume an incorporated document's contents are true for purposes of a motion to dismiss. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

While the Legislative Audit has already been judicially noticed, this doctrine more particularly ensures that the references to the material do not misrepresent its contents. Because the Plaintiffs have referenced the performance audit throughout the Complaint and stated at the hearing that their case arises from it, the audit is a proper subject of incorporation-by-reference. The Court may consider statements in the performance audit as true for purposes of the Motion. Having determined that the audit is the proper subject of both judicial notice and incorporation-by-reference, the Court will take up the substantive arguments of the Motion.

### C. Plaintiffs' negligence claims are dismissed, with leave to amend claims related to excessive toxicology testing.

A common law negligence claim consists of four elements: the existence of a legal duty, breach of that duty, causation of harm, and resulting damages. *Anderson v. ReconTrust Co., N.A.*, 407 P.3d 692, 699 (Mont. 2017). Maximus argues that Plaintiffs have failed to make any *prima facie* showing of negligence because "Plaintiffs have not alleged the existence of a legal duty Maximus owed to [MAP] participants, much less facts to demonstrate that Maximus breached any such duty. Moreover, Plaintiffs have failed to allege facts to demonstrate how Maximus's conduct causes them any harm." (Doc. 22 at 16). Plaintiffs contend that demonstrating a violation of national industry standards intended to protect the public can meet the duty and breach elements of negligence. (Doc. 26 at 10-11) (citing *Malcolm v. Evenflo Co.* 217 P.3d 514, 521 (Mont. 2009); *Schmidt v. Wash. Contractors Group, Inc.*, 964 P.2d 34, (Mont. 1998); and, *Martel v. Mont. Power Co.*, 752 P.2d 140, 145 (Mont. 1998)). Plaintiffs point to standards promulgated by the Federation of State Physician Health Programs (FSPHP) and the American Society of Addiction Medicine, along with "commonly accepted duties of care that define the duties owed to program participants" to support the following assertions:

- Medical professional monitoring programs must never put profits ahead of participant recovery;
- Medical professional monitoring programs must base all decisions on clinical evidence, not financial gain;

- Program administrators must provide transparent access to monitoring records, including medical records, evaluations, and test results;
- Monitoring requirements must be clinically justified and documented;
- Medical professional monitoring programs must not impose excessive costs on participants or impose sanctions that are not guided by clinical recommendations; and
- Medical professional monitoring programs must follow evidence based standards for toxicology testing and frequency.

(Doc. 1 at 3).

The cases cited by Plaintiffs establish that national industry standards may define a minimum standard of care, but do not always affirmatively establish a duty. In *Malcolm*, a strict liability case, the Montana Supreme Court recognized that "a violation of 'design standards intended to protect the public' constitutes negligence per se" and that "evidence of compliance with [a] . . . national industry standard or code" may constitute a "minimum standard" of care, but it declined to apply common-law negligence principles to cases asserting strict liability. *Malcolm*, 217 P.3d at 521 (citing *Schmidt*, 964 P.2d at 39 and *Martel*, 752 P.2d at 142). In *Martel*, the Montana Supreme Court held that a party in "bare compliance" with state law and national industry standards may still be liable for negligence "[i]f the circumstances are such that a danger exists beyond the minimum" set forth within the statute or standards. *Martel*, 752 P.2d at 145. In *Schmidt*, the Montana Supreme Court reasoned that because relevant safety standards found in the Manual of Uniform Traffic Control Devices ("MUTCD") promulgated by the Montana Highway Department had the "force of law,"

evidence of a violation of the MUTCD in maintaining a construction zone was "admissible to show negligence," but that "evidence of compliance with the MUTCD does not necessarily establish due care because the MUTCD, like any other national industry standard or code, is only a minimum standard." *Schmidt*, 964 P.2d at 39. Perhaps more elucidating is the Montana Supreme Court's summary of this underlying principle in *Runkle v. Burlington N.*, 613 P.2d 982 (Mont. 1980):

> Unless the codes or standards are adopted by a governmental agency so as to have the force of law, they are not to be admitted as conclusively determining the standard of care imposed upon the defendant . . . nor as substantive evidence of negligence, unless coupled with a showing of general acceptance in the industry concerned.

*Runkle*, 613 P.2d at 993 (citations omitted). The *Runkle* decision was discussed further in *Lynch v. Reed*, 944 P.2d 218 (Mont. 1997):

> We interpret this rule as providing two separate tests for the admissibility of codes or standards: 1) a code or standard sought to be admitted for the purpose of 'conclusively determining the standard of care imposed upon the defendant' must have been adopted by a governmental agency so as to have the force of law; 2) where a code or standard does not have the force of law, it may nevertheless be admitted as substantive evidence of negligence if it is coupled with a showing of general acceptance in the industry concerned.

944 P.2d at 228.

Plaintiffs provide no evidence suggesting that standards promulgated by either the FSPHP or the American Society of Addiction Medicine have been

adopted by a governmental agency or have the force of law. However, Plaintiffs do argue the standards upon which they rely to establish duty and breach are "widely recognized standards governing the administration of medical professional monitoring programs." (Doc. 1 at 2). Moreover, "each person is responsible not only for the results of the person's willful acts but also for an injury occasioned to another by the person's want of ordinary care or skill . . . so far as the person has willfully or by want of ordinary care" brought injury upon another. (Doc. 26 at 11 (citing 57A Am. Jur. 2d Negligence §§ 72-73)). Plaintiffs assert that Maximus breached its duty of ordinary care to MAP participants in direct violation of these "hornbook legal principles." *Id.*

At the hearing, Plaintiffs shifted their theory by arguing that the duties were based on the Agreement. Pointing to Section 3 of the Agreement, Plaintiffs argued that Agreement created contractual duties Maximus owed to the Plaintiffs, specifically:

> [Maximus] will operate the Assistance Program for the purpose of monitoring the rehabilitation of participating boards' licensees . . . . [Maximus] will assist participants' rehabilitation process by: coordinating referrals and connecting participant licensees to health care provider qualified to diagnose and treat impairment; providing education and outreach to licensees, employers, and other support persons and stakeholders; coordinating the completion of impairment and fitness to practice evaluations; monitoring licensees to ensure compliance with evaluation recommendations regarding treatment and aftercare; and reporting to the Department of Labor and Industry and the boards regarding licensees' compliance with treatment requirements and the services provided by the Assistance Program.

(Doc. 22-1 at 2). Plaintiffs also reference Section 3.2, which requires Maximus to "utilize evidence-based criteria to determine appropriate treatment and monitoring agreement components," and Section 4 that warrants that Maximus will provide these services. (Doc. 22-1 at 3-4). Maximus responded that their sole duty under the Agreement was to monitor compliance, and that none of the duties alleged relate to its central obligation.

Defendant further argues that, even if Plaintiffs can show a legal duty and breach, their negligence claims should fail for lack of causation and damages. (Doc. 22 at 13). "A claim possesses facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In their Complaint, Plaintiffs allege Maximus's breach of duties has led to MAP participants suffering "financial harm, emotional distress, loss of their license and livelihood, and in one particularly tragic outcome, a participant committed suicide." (Doc. 1 at 34). Plaintiffs further allege that, as a result, MAP participants have "suffered foreseeable general and special damages in an amount that exceeds $75,000." *Id.*

Plaintiffs' Complaint is devoid of causal factual allegations. At best, the damages alleged are vague. From what the Court can discern, Plaintiffs seem to imply two distinct damages: (1) damages incurred by the deprivation of their

professional licensure, and (2) damages incurred due to unreasonable costs imposed by Maximus on Plaintiffs through the administration of the MAP, i.e., excessive toxicology testing. Apart from the word "Due," in paragraph 34 of the Complaint, there are no facts to indicate causation. The legal claims are no better, repeating, "[a]s a direct and proximate result of Maximus' [actions]," with no elaboration. (Doc. 1 at ¶¶ 44, 52, and 59).

Causation is an "essential element[]" of a tort claim. *Fisher v. Swift Transp. Co., Inc.*, 181 P.3d 601, 607 (Mont. 2008); *Labair v. Carey*, 291 P.3d 1160, 1168-69 (Mont. 2012). The Complaint, as pleaded, cannot satisfy this element. The only question is whether to grant leave to amend. At the hearing, Plaintiffs argued that Maximus unreasonably subjected them to excessive testing and deprived them of their licensure by keeping them in the MAP. The Court finds the second claim implausible when considering the Legislative Audit.

As articulated by the Plaintiffs, they had no recourse once they entered the MAP but to comply with Maximus's directives or lose their licensure. However, the Legislative Audit recounts that participants could address appeals or concerns to "the participant's licensure board or the DLI staff liaison between the department and the vendor." Legislative Audit at 27. While the performance audit acknowledges that participants may face a "perceived barrier" because the staff liaison is also an executive officer for their board, the review process acts as a

check on Maximus. *Id.* The performance audit describes the process for DLI intervention:

> This DLI liaison handles participant concerns and complaints regarding the vendor. Their role involves gathering information from both the participants and vendor and considers program policies and procedures in the context of the participant's situation. Based on this information, DLI determines whether further action is needed or if the issue stems from the participant's inability to meet the program's monitoring requirements. The department intervenes on behalf of participants when they deem necessary. The staff member emphasized their ability and need to assess whether an individual is in a position to meet their requirements and take responsibility for their recovery.

*Id.* Any participant that was dissatisfied with Maximus could file a complaint with the DLI liaison, who would investigate their claim. If DLI found that the claim had merit, it could intervene. The respective boards, not Maximus, held the sole authority for issuance and reinstatement of licensure. *See generally* Mont. Code Ann. § 37-1-314.

Based on the Agreement, state licensure law, and the performance audit on which Plaintiffs' case relies, the Court finds that amendment would be futile regarding claims of damages regarding licensure. The Court will not allow Plaintiffs to pursue a claim that Maximus may have circumvented the review process to deprive Plaintiffs of licenses that only their respective boards have the authority to reinstate.

However, Plaintiffs' claims regarding excessive testing appear more plausible. Plaintiffs allege that Maximus required them to engage in excessive

testing at prices much greater than necessary. (Doc. 1 at ¶ 27). Plaintiffs allege that the testing was "not clinically indicated and unnecessary." *Id.* Plaintiffs also allege that the excessive testing harmed them "financially and emotionally." *Id.*

Maximus plausibly owed a duty to Plaintiffs to "use toxicology testing consistent with clinical assessment." *Id.* The Agreement requires Maximus to "utilize evidence-based criteria to determine appropriate treatment and monitoring agreement components based on diagnosis . . . ." (Doc. 22-1 at 3). Even so, the Court finds that the Complaint lacks specific facts that would enable it to determine whether Maximus has breached its duty. The Complaint lacks allegations that would enable the Court to determine an appropriate standard for the duty Maximus owed to Plaintiffs. Without a factual baseline, the Court cannot assess whether a breach occurred. Accordingly, Plaintiffs shall be given leave to amend their claim regarding excessive toxicology testing.

**D. The Court will dismiss Plaintiffs' allegations of MCPA violations.**

The MCPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in conduct of any trade or commerce" and grants "a consumer who suffers any ascertainable loss . . . as a result of the use or employment by another person of a method, act, or practice declared unlawful by 30-14-103" a private right of action to sue in district court. Mont. Code Ann. § 30-14-133(1). Plaintiffs represent they are "consumers as defined in

§ 30-14-102(1), MCA" and that "Maximus engaged in 'trade' and 'commerce' as defined in § 30-14-102(8), MCA" in a deceptive or unfair manner in violation of the MCPA. (Doc. 1 at 20); Mont. Code Ann. § 30-14-101 et. seq. Defendants argue Plaintiffs are not "consumers" and that they have not alleged deceptive or unfair practices. (Docs. 22 at 14-15 and 27 at 6-7).

The MCPA defines a "consumer" as "a person who purchases or leases goods, services, real property, or information primarily for personal, family, or household purposes." Mont. Code Ann. § 30-14-102. Since a MCPA claim is only available to consumers, *Kostelecky v. Peas in a Pod LLC*, 518 P.3d 840, 861 (Mont. 2022), whether Plaintiffs fall under the definition of "consumers" under the MCPA is a threshold issue with respect to their claim under Count II.

While Plaintiffs' well-pled facts must be taken as true, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft*, 556 U.S. at 678. Plaintiffs' assertion that they qualify as consumers under the MCPA is a legal conclusion. In attempting to show they meet the statutory definition of consumers, Plaintiffs claim they were forced to pay "grossly excessive fees" (Doc. 1 at 10) for Maximus's required toxicology testing and that the MAP is a program geared towards "a person's personal health," rather than a service provided for business purposes (Doc. 27 at 14-15).

Plaintiffs' argument is unconvincing. Even if Plaintiffs were to have "purchased" Maximus's services, there is no indication that they did so "*primarily* for personal, family, or household purposes." Mont. Code Ann. § 30-14-102 (emphasis added). As previously discussed, Maximus's administration of the MAP arises out of a contract with the State and is designed to "assist and rehabilitate licensees" who are found to be physically or mentally impaired by habitual intemperance, substance abuse, or otherwise unfit to perform their job duties due to similar impairment. Mont. Code Ann. §§ 37-8-202(1)(j); 37-4-311; 37-7-201(4)(g); 37-8-202(1)(j); 37-12-201(7); 37-18-204. The licensee-licensor relationship between Maximus and MAP participants is much more indicative of a business relationship than that of a purchaser for personal, family, or household use. As Maximus notes, Plaintiffs nearly concede they were in a business relationship with Maximus in seeking damages centered around disruption of their "ability to work" and perform duties related to "their professional licenses and employment." (Doc. 26 at 7; *see also* Doc. 1 at 1, 19, 34, and 53-58). In alleging their tortious interference with business relations claim, Plaintiffs further state they "have a valid business relationship in their professional licenses and employment," which Maximus "was informed and actually knew of." (Doc. 1 at 21).

Albeit not an identical comparison, this Court has refused to apply the definition of "consumer" under the MCPA to a study participant who purchased

experimental drugs as part of a study on improving asbestosis symptoms. *Vinion et. al v. AMGEN, Inc.*, 2004 WL 6057351, at * 4 (D. Mont. 2004). The Court found that the participant did not purchase the medicine "primarily for personal purposes" but, rather, "for the benefit of the study, which, if he is lucky, has a personal beneficial result." *Id.* Similarly, one could say the MAP participants complied with Maximus's program requirements (which may have involved purchasing toxicology testing) for the benefit program which, if completed, may very well result in personal gain. Plaintiffs simply do not meet the statutory definition of "consumers," and their MCPA claim must be dismissed. The Court further concludes that Plaintiffs are unlikely to satisfy the definition of "consumers" under any cognizable set of facts, so Plaintiffs will not be given the opportunity to amend Count II. *Jackson,* 353 F.3d at 758.

**E. Plaintiffs' Tortious Interference Claim Shall be Dismissed.**

Next, Plaintiffs claim that Maximus "acted without right or justifiable cause to interfere with Plaintiffs' and Class Members' business relationships." (Doc. 1 at 22). Again, the "business relationships" to which Plaintiffs refer are between Plaintiffs, their professional licensing board(s), and employers. *Id.* at 21. Plaintiffs allege general and special damages exceeding $75,000 as a result of Maximus's "interference with their business relationships" in a manner that "contradicted professional standards and prolonged or delayed return to their profession." *Id.*

To demonstrate a valid claim for tortious interference with business relations, Plaintiffs must show that Maximus's acts: (1) were intentional and willful; (2) were calculated to cause damage to Plaintiffs' business; (3) were done with the unlawful purpose of causing damage or loss, without right or justifiable cause; and (4) resulted in actual damages or loss. *Maloney v. Home and Investment Center, Inc.*, 994 P.2d 1124, 1132 (Mont. 2000). Under this theory "the legal inquiry is on the intentional acts of the 'malicious interloper' in disrupting a business relationship." *Id.* ("a person who is involved in an economic relationship with another, or who is pursuing reasonable and legitimate prospects of entering such a relationship, is protected from a third person's wrongful conduct which is intended to disrupt the relationship") (quoting *Ellis v. City of Valdez*, 686 P.2d 700, 707 (Alaska 1984)).

In Count III of their Complaint, Plaintiffs "incorporate and reallege" the 52 preceding paragraphs of the document, leaving the Court to parse through which facts are relevant to their tortious interference claim. (Doc. 1 at 21). It appears Plaintiffs generally allege that Maximus's administration of the MAP negatively impacted their employment or ability to retain their professional licenses. Specifically, Plaintiffs assert: "Maximus arbitrarily prolonged [MAP] participation, potentially for financial gain," (Doc. 1 at 9); "Maximus . . . [uses] an inadequate online system that prevents participants from accessing or verifying

information and records and routinely denies participants access to records about their participation," *Id.* at 11; "Maximus prioritized financial gain over participant well-being," *Id.* at 12; and, "Maximus runs the program as punitive, invasive, and punishingly expensive, all to the detriment of its participants." *Id.* at 16.

Accepting Plaintiffs' alleged damages for purposes of the Rule 12 motion, their tortious interference claim still lacks a showing on whether Maximus's acts were intentionally calculated to cause damage to the business relationship as described by Plaintiffs. Beyond reciting the elements of tortious interference in Count III (Doc. 1 at 21), Plaintiffs do not provide facts that demonstrate how Maximus acted intentionally or willfully in a way calculated to cause them damage. First, Plaintiffs do not allege Maximus performed in any way outside of the scope of its agreement with the State in administering the MAP. Second, that Maximus "potentially" experienced financial gain is speculative, as Plaintiffs offer no facts supporting that accusation. Third, that Maximus may have prioritized financial gain does not, on its face, demonstrate it did so for the calculated purpose of causing damage to Plaintiffs. The Court does not find Plaintiffs' Complaint contains facts alleging every element of their tortious interference claim.

For the same reasons outlined above in negligence regarding professional licensure, Plaintiffs cannot demonstrate that Maximus caused them to be deprived

of their licenses. Therefore, the Court finds that amendment would be futile. Accordingly, this claim shall be dismissed without leave to amend.

**F. Plaintiffs Shall be Given Leave to Amend Their Claim for Breach of the Covenant of Good Faith and Fair Dealing**

A contract has four essential elements: (1) identifiable parties capable of contracting; (2) consent; (3) a lawful object; and (4) consideration. *Lenz v. FSC Securities Corp.*, 414 P.3d 1262, 1271 (Mont. 2018). Consent can be demonstrated by a "mutual assent" or "meeting of the minds on all essential terms to form a binding contract" and is established when there is an offer followed by acceptance of that offer." *Kessun Partners v. Ferdig Oil Co., Inc.*, 816 P.2d 417, 421 (Mont. 1991). "[E]very contract, regardless of type, contains an implied covenant of good faith and fair dealing. A breach of the covenant is a breach of the contract." *Story v. Bozeman*, 791 P.2d 767, 776 (Mont. 1990); *see also* Restatement (Second) of Contracts § 205 (A.L.I. 1981) ("[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement"). State law requires all parties in contract to deal honestly in fact and "observe reasonable commercial standards of fair dealing in the trade." Mont. Code Ann. § 28-1-211. Although an exceptional remedy, the tort of breaching the implied covenant in bad faith is "available in contracts involving special relationships which are not otherwise controlled by specific statutory provisions." *Story*, 791 P.2d at 776. In

*Story*, the Montana Supreme Court adopted the following test to delineate "special relationships:"

> (1) the contract must be such that the parties are in inherently unequal bargaining positions;
>
> (2) the motivation for entering the contract must be a non-profit motivation, i.e., to secure peace of mind, security, future protection;
>
> (3) ordinary contract damages are not adequate because
>
> > (a) they do not require the party in the superior position to account for its actions, and
> >
> > (b) they do not make the inferior party 'whole';
>
> (4) one party is especially vulnerable because of the type of harm it may suffer and of necessity places trust in the other party to perform; and
>
> (5) the other party is aware of this vulnerability.

*Id.* (citing *Wallis v. Sup. Ct. of San Bernadino Cnty.*, 160 Cal.App.3d 1109, 1118 (Cal. Ct. App. 1984)). The tort claim, in addition to the contract claim, thus "serves to discourage oppression in contracts which necessarily give one party a superior position." *Story*, 791 P.2d at 776. Accordingly, tortious bad faith subjects the tortfeasor to a broader measure of damages (including punitive damages) than a typical contract claim. *Draggin' Y Cattle Co. v. Junkermier, Clark, Campanella, Stevens, P.C.*, 439 P.3d 935, n.4 (Mont. 2019).

Plaintiffs represent that "a special relationship exists between Maximus and Plaintiffs and Class Members" and "Maximus did not act with honesty in fact or observe reasonable commercial standards of fair dealing, thus breaching the contractual covenant of good faith and fair dealing." (Doc. 1 at 22). Plaintiffs seek

relief under both the contract theory and tort theory of their claim. *Id.* Maximus argues that, without specific facts to support the existence of "special relationship elements," Plaintiffs' claim is illusory. (Doc. 27 at 11).[5]

Both parties cite *Puryer v. HSBC Bank USA, N.A.*, 419 P.3d 105 (Mont. 2018) to suggest pleading the mere existence of a special relationship and a breach of the implied covenant is either sufficient or insufficient for the tort claim to survive dismissal. (Docs. 26 at 22; 27 at 11). In *Puryer*, the Montana Supreme Court reversed the District Court's dismissal of Puryer's tortious breach of the implied covenant claim against her Lender. *Puryer*, 419 P.3d at 115. The *Puryer* Court reasoned:

> Puryer's Amended Complaint alleged a contract existed and based on the Lenders' conduct they breached the implied covenant by not acting honestly and failing to observe reasonable commercial standards of fair dealing. Further, Puryer's Amended Complaint alleged the contract at issue—Deed of Trust—which financed Puryer's personal residence creates a special relationship as required by *Story*. Taking the allegations as true, Puryer has sufficiently pled both a contractual breach of the implied covenant and a tortious breach of the implied covenant in her Amended Complaint to survive a 12(b)(6) motion to dismiss.

---

[5] Notably, the parties have not briefed the question of whether a contract exists between Plaintiffs and Maximus. There is no doubt that a contract exists between Maximus and the State. (Doc. 1 at 7). To its brief supporting the motion to dismiss, Maximus attaches a sample MAP "Agreement" and states: "[p]articipants certify that they have read, initialed, and agreed to the terms of the monitoring agreement, that they understand they must comply with the terms to stay in the Program, and that non-compliance with any term can be reported to their licensing board." (Docs. 22 at 13 and 22-2 at 8, 19). Assuming for the purpose of this Order that Plaintiffs assented to these Agreements, with consideration being rehabilitative benefits for Plaintiffs, the Court moves forward in its analysis of Plaintiffs' breach of implied covenant claim.

*Id.* at 112. The Montana Supreme Court further noted that a determination of whether a special relationship exists may be more appropriate for summary judgment or at trial. *Id.* at 112-13.

Like *Puryer*'s, Plaintiffs' Complaint alleges the existence and breach of a contract based on Maximus's allegedly dishonest conduct by failing to observe reasonable commercial standards in the administration of the MAP. Plaintiffs explicitly allege the creation of a special relationship. The Court need not wade into whether a special relationship is actually present to decide Maximus's motion.

In addition, Plaintiffs filed their Complaint without the benefit of the Agreement. Given their assertion at the hearing that the Agreement may be the basis for some of Maximus's obligations, the Court anticipates that this claim may be more properly articulated in an amended complaint.

### G. Plaintiffs' punitive damages claim is improperly included in their Complaint.

In 1983, the Montana Supreme Court first recognized that the breach of an implied covenant of good faith and fair dealing is a tort for which punitive damages may be awarded. *Gates v. Life of Mont.*, 668 P.2d 213, 215 (Mont. 1983). Section 27-1-221(1), MCA provides that "punitive damages may be awarded when the defendant has been found guilty of actual fraud or actual malice." Maximus focuses on the apparent lack of facts pled in the Complaint to demonstrate actual fraud or actual malice. (Doc. 27 at 11-12). Plaintiffs contend that citation to

§ 27-1-221, MCA suffices "at this stage of litigation" to overcome dismissal. However, § 27-1-221(5), MCA clearly states: "[a] request for an award of punitive damages may not be contained within an initial pleading filed by a party with the court." Only after the initial pleading is filed and discovery has commenced may a party move to amend its pleading to assert a claim for punitive damages. *Id.* Plaintiffs' Complaint includes a "demand" for "punitive damages under § 27-1-221, MCA," which does not comply with law. Plaintiffs conceded at the hearing that the request for punitive damages was improper at this stage. Therefore, Plaintiffs request for punitive damages must be removed from their Complaint.

## IV. Conclusion

Plaintiffs' Complaint is facially deficient in some aspects. These faults proved dispositive to resolution of most of their claims. However, Plaintiffs have alleged sufficient facts regarding excessive toxicology testing that they are given leave to amend the Complaint to proceed under a more streamlined theory related to damages stemming from those factual allegations. They also may prosecute the claim of the alleged breach of the covenant of good faith and fair dealing. Accordingly,

**IT IS HEREBY ORDERED** that the Motion is GRANTED IN PART and DENIED IN PART, as follows:

1. As to Plaintiffs' Count I (Negligence), Maximus's Motion is GRANTED. All claims relating to professional licensure are DISMISSED WITH PREJUDICE and claims related to excessive toxicology testing are DISMISSED WITHOUT PREJUDICE.

2. As to Plaintiffs' Count II (Violations of Mont. Code Ann. § 30-14-101 et seq.), Maximus's Motion is GRANTED and Plaintiffs' MCPA claim is DISMISSED WITH PREJUDICE.

3. As to Plaintiffs' Count III (Tortious Interference with Business Relations), Maximus's Motion is GRANTED and Plaintiffs' tortious interference claim is DISMISSED WITH PREJUDICE.

4. As to Plaintiffs' Count IV (Breach of Covenant of Good Faith and Fair Dealing), Maximus's Motion is DENIED.

5. As to Plaintiffs' demand for punitive damages, Maximus's Motion is neither granted nor denied, but the punitive damages claim is STRICKEN from the Complaint, in accordance with § 27-1-221(5), MCA, and pursuant to Federal Rule of Civil Procedure 12(f)(1).

**IT IS FURTHER ORDERED** that Plaintiffs shall be granted leave to amend their Complaint up to and including October 16, 2026.

The Clerk of Court is directed to notify the parties of the making of this Order.

DATED this 29th day of September, 2026.

WILLIAM W. MERCER
UNITED STATES DISTRICT JUDGE